UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

IN RE: REFRIGERANT COMPRESSORS
ANTITRUST LITIGATION

This Document Relates to:
    All Indirect Purchaser Actions

MDL No. 2:09-02042

Honorable Sean F. Cox

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, by their undersigned attorneys, individually and on behalf of all other end payor purchasers similarly situated, bring this action for damages, and/or restitution pursuant to the antitrust and/or consumer protection laws of Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin ("Class Jurisdictions") against Defendants, and demand a trial by jury.

## NATURE OF THE CASE

1.      This case arises from a long-running, world-wide conspiracy among the Defendants named herein and various unnamed co-conspirators to fix, raise, maintain, and/or stabilize the prices of, and to allocate customers and markets for, Hermetic Compressors (as defined below), thus artificially raising the prices for Hermetic Compressors and products containing Hermetic Compressors ("Hermetic Compressors manufactured by one or more Defendants when included in this Complaint with products containing such compressors are referred to as "Hermetic Compressor Products") sold in the Class Jurisdictions and each of its

individual states and territories during the period from January 1, 1996 through December 31, 2009 (the "Class Period").

2.      Substantial evidence shows that the alleged conspiracy was effective and that end-payor purchasers of Hermetic Compressors Products were among its many victims.

3.      In general, Hermetic Compressors are devices used to produce the "cooling" effect for a variety of refrigeration products, including, but not limited to, refrigerators, freezers, water coolers, and vending machines.  The Hermetic Compressor is the critical engine in refrigeration products.

4.      Defendants sold Hermetic Compressors through a number of channels, including in the refrigerator and freezer channel (the "R&F" channel or "R&F Market"), which is dominated by a few large Original Equipment Manufacturers ("OEMs"), including Electrolux and General Electric.

5.      Sales of Hermetic Compressors in the R&F channel involve a yearly bidding process by which the OEMs invite Defendants to compete for each OEM's yearly compressor needs.  The OEMs invite all the manufacturers of Hermetic Compressors to participate in the bidding at a location and time of the OEMs' choosing.   These negotiations are critical for buyers and sellers alike as the prices at which Hermetic Compressors are sold to the OEMs for the entire year are determined in the course of a few days.  All five Defendants actively participated in these meetings.

6.      Defendants, however, created a sham bidding system, secretly meeting before the annual contract negotiations, sharing bids with one another and agreeing upon prices.   In addition, Defendants allocated among each other respective shares of the OEM market.

Unbeknownst to the OEMs, their annual meetings had become an elaborate farce, with themselves in a starring role.

7.     As a result of Defendants' scheme, prices between 1996 and 2009 were artificially inflated.   This overcharge was then passed on to end payors in the form of inflated prices for Hermetic Compressors and products containing them, such as refrigerators and freezers.

8.     In February 2009, as part of a coordinated international investigation into price fixing and customer and market allocation in the multi-billion dollar Hermetic Compressors industry, antitrust authorities in the United States, the European Union, and Brazil announced that they had raided several businesses run by Defendants.

9.     The DOJ's Antitrust Division has issued grand jury subpoenas to Defendants Tecumseh Products Company and Whirlpool Corporation, and is investigating several U.S.-based Danfoss Defendants (as defined below) as well as Defendant Panasonic Corporation of North America. Tecumseh has entered into cooperation agreements with authorities in the U.S. and elsewhere, pursuant to which it has admitted the existence of the conspiracy and its role in the conspiracy.

10.     According to information released by Brazilian antitrust regulators, the alleged conspiracy to fix prices of Hermetic Compressors in the R&F Market lasted 12 years and involved agreements to allocate markets and customers, and exchanges of commercially sensitive information related to Hermetic Compressors, including pricing information. Defendants' executives carried out the conspiracy through in-person meetings in hotels, restaurants, and other locations, and by telephone and e-mail.

11.     As a result of the conspiracy, prices for Hermetic Compressors and the products

3

containing Hermetic Compressors were artificially fixed, raised, or maintained at supracompetitive levels. Indeed, the Brazilian press has reported that, in 2008 alone, the conspiracy may have caused losses of approximately BRL 125 million ($425 million). Additionally, Defendant Embraco recently agreed to pay approximately $57 million to the Brazilian Justice of Ministry's antitrust division for its participation in this unlawful cartel.

12.    Seeking recovery for the financial harm that the conspiracy inflicted on the consuming public in the Class Jurisdictions, Plaintiffs bring this action on behalf of themselves and all those similarly situated who purchased Hermetic Compressor Products as end payors from Defendants in one of the Class Jurisdictions during the Class Period.

## JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

14.    The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

15.    Venue is proper in this District pursuant  28 U.S.C. § 1391(a) and (b) because during the Class Period certain Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District.

16.    Defendants' conspiracy to fix the prices of Hermetic Compressors substantially affected commerce throughout the United States, and in each of the Class Jurisdictions, because Defendants directly, or through their agents, engaged in activities affecting each state.

Defendants have purposefully availed themselves of the laws of each of the Class Jurisdictions in connection with their activities relating to the production, marketing, sale, and/or distribution of Hermetic Compressors.   Defendants produced, promoted, sold, marketed, and/or distributed Hermetic Compressors, thereby purposefully profiting from access to end-payor purchasers in each Class Jurisdiction.  As a result of the activities described herein, Defendants:

    a.   Caused damage to the residents of the states identified herein;

    b.   Caused damage in each of the Class Jurisdictions by acts or omissions committed outside each state and by regularly doing or soliciting business in each state;

    c.   Engaged in a persistent course of conduct within each state and/or derived substantial revenue from the marketing and sale of Hermetic Compressors in each state; and

    d.   Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in each Class Jurisdiction while regularly doing or soliciting business in each state, engaging in other persistent courses of conduct in each state and/or deriving substantial revenue from the marketing and sale of Hermetic Compressors in each state.

17.    The conspiracy described herein adversely affected persons nationwide, and more particularly, consumers in each of the Class Jurisdictions, who purchased Defendants' Hermetic Compressors as end payors.  Defendants' conspiracy has resulted in an adverse monetary effect on end-payor purchasers in each Class Jurisdiction.

18.    Prices of Hermetic Compressors and products containing Hermetic Compressors in each Class Jurisdiction were raised to supra-competitive levels by the Defendants and their co-

conspirators.  Defendants knew that commerce in Hermetic Compressors in each of the Class Jurisdictions would be adversely affected by implementing their conspiracy.

## PARTIES

### Plaintiffs

19.    During the Class Period, the following Plaintiffs purchased Hermetic Compressor Products as end payors, and not for resale, manufactured by one or more Defendants.  As a result of the conspiracy alleged, Plaintiffs suffered pecuniary injury.

20.    Plaintiff Air Cooling Energy Corp. maintains its principal place of business in Flushing, NY.

21.    Plaintiff Marc A. Barash is a resident of Mt. Vernon, New York.

22.    Plaintiff Bongo Burger, Inc. is a California corporation with its principal place of business located in Berkeley, California.

23.    Plaintiff Scott Burgess resides in Kanawha County, West Virginia.

24.    Plaintiff Julie Clark resides in Overland Park, Kansas.

25.    Plaintiff Kevin M. Dean resides in Sullivan, New Hampshire.

26.    Plaintiff Nathan Levi Esquerra resides in Glendale, Arizona.

27.    Plaintiff F.G. Farah & Partners, LLC (d/b/a Listrani's Italian Gourmet & Pizzeria) is a limited liability company headquartered and residing in Washington, D.C.

28.    Plaintiff Maria Gounaris resides in Walnut Creek, California.

29.    Plaintiff Ingegerd Hesel resides in Ft. Myers, Florida.

30.    Plaintiff Thomas D. Hobbs, Jr. resides in Signal Mountain, Tennessee.

31.     Plaintiff Royal W. Leith, III resides in Cambridge, Massachusetts.   Pursuant to Mass. Gen. L. Ch. 93A §§ 2 and 9, Plaintiff Leith made demand upon Defendants in the form of a letter sent to each Defendant on January 28, 2010.   Plaintiff Leith purchased a Hermetic Compressor in Massachusetts.

32.     Plaintiff Karla P. Levi resides in Mooresville, North Carolina.

33.     Plaintiff Saad Wholesale, Inc. is a Michigan corporation with its principal place of business at Detroit, Michigan.

34.     Plaintiff Beatrice Scannapieco resides in Santa Fe, New Mexico.

35.     Plaintiff Pat Tiede resides in Madison, Wisconsin.

36.     Plaintiff Victoria Winslow resides in Petaluma, California.

### Defendants

### The Tecumseh Entities

37.     Defendant Tecumseh Products Company ("Tecumseh") is a Michigan corporation headquartered in Ann Arbor, Michigan.   Tecumseh is a full-line, global manufacturer of Hermetic Compressors.   Tecumseh is one of the largest sellers of Hermetic Compressors in the U.S. market, and is also one of the largest global producers of Hermetic Compressors.   Tecumseh maintains production and sales operations in North and South America, Europe and Asia. Tecumseh alone possesses a substantial portion of the U.S. compressor market.   During the Class Period, Tecumseh, directly and/or through its wholly-owned domestic and foreign subsidiaries, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

38.     Defendant Tecumseh Compressor Company ("Tecumseh Compressor") is a Delaware corporation headquartered in Tecumseh, Michigan.   Tecumseh Compressor is a

wholly-owned subsidiary of Tecumseh.  During the Class Period, Tecumseh Compressor, directly and/or through its parent company Tecumseh and Tecumseh's other wholly-owned subsidiaries, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

39.     Defendant Tecumseh do Brasil, Ltda. ("Tecumseh Brasil") is a Brazilian corporation headquartered in Sao Carlos, Brazil and is a wholly-owned subsidiary of Tecumseh. Tecumseh Brasil is one of the world's largest Hermetic Compressor producers.  Tecumseh Brasil operates two manufacturing facilities in Brazil with a combined annual compressor capacity of 17 million units.  Tecumseh Brasil is the largest source of Hermetic Compressors sold by Tecumseh and its subsidiaries.  Hermetic Compressors produced at Tecumseh Brasil's facilities are shipped and sold throughout the world, including the United States.  During the Class Period, Tecumseh Brasil, directly and/or through its parent Tecumseh, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

40.     Defendant Tecumseh do Brasil USA, LLC ("Tecumseh Brasil USA") is a Delaware limited-liability company headquartered in Clinton, Michigan.  Tecumseh Brasil USA is a wholly-owned subsidiary of Tecumseh Brasil.  Tecumseh Brasil USA, directly and/or through its parent companies Tecumseh and Tecumseh Brasil, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold during the Class Period in this District and throughout the United States, including the Class Jurisdictions.

**The Whirlpool Entities**

41.     Defendant Whirlpool Corporation ("Whirlpool") is a Delaware corporation headquartered in Benton Harbor, Michigan.  Whirlpool is a large producer and seller of finished

household appliances containing Hermetic Compressors sold under its Whirlpool, Maytag, Jenn-Air, KitchenAid, Amana, Brastemp, Consul, and Bauknecht brand names.   During the Class Period, Whirlpool, directly and/or through its wholly-owned subsidiary Defendant Whirlpool S.A., manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

42.     Defendant Whirlpool S.A. ("Whirlpool S.A." or "Embraco"), a subsidiary of Whirlpool that operated under the name Embraco, S.A. until mid-2006, is a Brazilian corporation headquartered in Joinville, Brazil.  Embraco is Whirlpool's "Brazil-based compressor business" and has been affiliated with Whirlpool since the 1950s.  It has been controlled by Whirlpool since 1997.   Embraco, with an estimated 25 percent share of the global market for Hermetic Compressors, has extensive compressor production facilities in Brazil, Europe, and Asia.  Embraco exports the Hermetic Compressors produced at its Brazilian factories to the United States.  Hermetic Compressors manufactured by Embraco, as well as other Defendants, are included as components of various appliances sold by its parent Whirlpool under various brand names.  During the Class Period, Embraco, directly and/or through its parent, Whirlpool, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

43.     Defendant Embraco North America, Inc. ("Embraco N.A.") is a Delaware corporation headquartered in Suwannee, Georgia.  Embraco N.A. is a wholly-owned subsidiary of Embraco.  Embraco N.A. is responsible for, among other things, "selling Embraco products in North America."  During the Class Period, Embraco N.A., directly and/or through its parent companies Whirlpool and Embraco, manufactured, marketed, and/or sold Hermetic Compressors

for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

### The Danfoss Entities

44.     Defendant Danfoss's A/S ("Danfoss") is a Danish corporation headquartered in Nordborg, Denmark.   Danfoss is one of the largest Hermetic Compressor manufacturers in Europe.  Danfoss' Refrigeration and Air-Conditioning Division is responsible for manufacturing and selling the company's Hermetic Compressors and maintains extensive operations throughout the world, including sales and marketing subsidiaries in the United States.   Danfoss's recent annual report states "the USA is now the [Refrigeration and Air-Conditioning] Division's largest market," with 2007 sales of approximately $180 million.  During the Class Period, Danfoss, directly and/or through its U.S. subsidiaries, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

45.     Defendant Danfoss, Inc. ("Danfoss, Inc.") is a Delaware corporation headquartered in Baltimore, Maryland.  Danfoss, Inc. is a wholly-owned subsidiary of Danfoss. Danfoss, Inc. is the primary sales and marketing arm of Danfoss in the United States, and serves as the headquarters for the U.S. operations of Danfoss's Refrigeration and Air-Conditioning Division.   During the Class Period, Danfoss, Inc. directly and/or through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

46.     Defendant Danfoss Commercial Compressors, Ltd. ("Danfoss Compressors") is a Delaware corporation headquartered in Lawrenceville, Georgia.   Danfoss Compressors is a wholly-owned subsidiary of Danfoss. During the Class Period, Danfoss Compressors, directly and/or

through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

47.     Defendant Danfoss Compressor, LLC ("Danfoss Compressor LLC") is a Delaware limited-liability company headquartered in Arkadelphia, Arkansas. Danfoss Compressor LLC is a wholly-owned subsidiary of Danfoss. During the Class Period, Danfoss Compressor LLC, directly and/or through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

48.     Defendant Danfoss Scroll Technologies, LLC (f/k/a Scroll Technologies, LLC) ("Danfoss Scroll Technologies") is a Delaware limited-liability company headquartered in Arkadelphia, Arkansas. During the Class Period, Danfoss Scroll Technologies was a wholly-owned subsidiary of Danfoss. Danfoss Scroll Technologies, directly and/or through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

49.     Defendant Danfoss Turbocor Compressors, Inc. ("Danfoss Turbocor") is a Delaware corporation headquartered in Tallahassee, Florida. Danfoss Turbocor is a joint venture between Danfoss and Canadian engineering firm Turbocor, Inc., with each joint venturer owning a 50 percent stake. During the Class Period, Danfoss Turbocor, directly and/or through its parent company Danfoss and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

**The Panasonic Entities**

50.     Defendant Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.) ("Panasonic"), is a Japanese corporation headquartered in Osaka, Japan.  During the Class Period, Panasonic, directly and/or through its U.S. subsidiary Defendant Panasonic Corporation of North America, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

51.     Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation headquartered in Secaucus, New Jersey.  Panasonic NA sells Hermetic Compressors in the United States through its Panasonic Industrial Company Division and is a wholly-owned subsidiary of Panasonic.  During the Class Period, Panasonic NA, directly and/or through its parent company Panasonic, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

**The ACC Entities**

52.     Defendant Appliances Components Companies, S.p.A. ("ACC"), is an Italian corporation headquartered in Pordeone, Italy.  During the Class Period, ACC, directly and/or through its wholly-owned U.S. subsidiary, Defendant ACC USA, LLC, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

53.     Defendant ACC USA, LLC ("ACC USA") is a Delaware limited-liability company headquartered in Madison, Alabama.  ACC USA is "an ACC branch office" operating as a "sales, engineering and distribution center in the USA."  In addition, "ACC USA provides

the North American market with high quality hermetic compressors." During the Class Period, ACC USA, directly and/or through its parent company ACC, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold in this District and throughout the United States, including the Class Jurisdictions.

## CO-CONSPIRATORS

54.     Various individuals, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Plaintiffs reserve the right to name some or all of these persons as defendants.

55.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

56.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for Hermetic Compressors made by its parent company.

## INTERSTATE TRADE AND COMMERCE

57.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce, in that Hermetic Compressors were sold to, and purchased by, both direct and end-payor purchasers in the United States. The nature of the end goods for which Defendants manufactured Hermetic

Compressors necessarily involved the distribution of the Defendants' Hermetic Compressors to every state in the United States and sales to purchasers in every state. Defendants knew the nature of these markets and the uses for which their products were designed, and thus that they received the benefits of the laws of each of the Class Jurisdictions in facilitating the sales of the products and purposefully availed themselves of the benefits, protections and laws of the Class Jurisdictions.

58.     Thus, during the Class Period, Defendants and their co-conspirators issued and sold substantial quantities of Hermetic Compressors in a continuous and uninterrupted flow of interstate commerce, including through and into this District and in each of the Class Jurisdictions.

59.     In sum, the conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in each of the Class Jurisdictions.

## FACTUAL ALLEGATIONS

### The Hermetic Compressors Industry

60.     Hermetic Compressors are devices, sealed in a metal casing, that use a piston-like mechanism to compress refrigerant gases ("Hermetic Compressors"). When the compressed gas moves through the other components of the refrigerant system and is permitted to expand, it removes heat from its surroundings, producing a cooling effect that forms the basis for a variety of refrigeration applications.

61.     Hermetic Compressors are sold as stand-alone products, which are then installed as cooling components in other products such as refrigerators. Hermetic Compressors are also sold in the aftermarket as replacement parts.

14

62.     Hermetic Compressors constitute a large majority of all compressors and compressor units (except automotive open compressors) sold in the United States.   Tecumseh, the amnesty applicant in the United States, European Union, and Brazil, manufactures and sells only hermetic and not rotary or reciprocating compressors.   Danfoss was the leading seller of Hermetic Compressors in the United States during the Class Period.

63.     For the purposes of this Complaint, the relevant Hermetic Compressors have less than one horse power and are used in commercial and household refrigeration applications.

64.     The Hermetic Compressors industry is a multi-billion dollar industry.   Total sales of the relevant Hermetic Compressors during the Class Period were in the billions of dollars.

65.     Hermetic Compressors were largely sold to OEMs which then incorporated them into consumer goods.   These goods were resold to, among others, end-payor purchaser plaintiffs.

66.     Throughout the Class Period, OEMs purchased Hermetic Compressors from Defendants pursuant to contracts that determine the prices for the subsequent year.   Contract negotiations were held at different places around the world at the OEMs' choosing.

## THE CONSPIRACY

67.     In an effort to increase revenues, Defendants banded together to rig bids made to OEMs prior to negotiations.

68.     In effectuating the conspiracy, the Defendants met secretly in order to conceal their bid rigging from the OEMs and the market.   Throughout the Class Period, Defendants regularly met to agree on pricing of, and market allocation strategies for, Hermetic Compressors.

69.     These conspiratorial meetings often occurred directly before contract negotiations with the OEMs and, for obvious reasons, were not disclosed to the OEMs or the public.   During

the course of these meetings, Defendants discussed general strategies in negotiating the coming years' contracts with the OEMs, and shared their proposed bids.

70.  In 2004 and 2005, for example, Defendants', including Tecumseh and Embraco, met in Europe prior to negotiations with the OEMs.  Defendants also engaged in telephone conversations to facilitate their bid rigging and market allocation scheme.

71.  In 2006, Defendants met again in Europe to discuss prices for Hermetic Compressors for 2007.

72.  Many of Defendants' top executives participated in these meetings.  A document from the Brazilian investigatory authority shows the following five executives, among others, were instrumental in furthering Defendants' conspiracy:

- Gerson Verissimo, the head of Defendant Tecumseh Brasil;
- Ernesto Henzelmann, CEO and President of Embraco;
- Valter Taranzano, CEO and President of ACC;
- Lars Snitkjaer, Director of Sales and Marketing for Danfoss; and
- Kaisha Masuda, Sales and Marketing Associate at Panasonic.

73.  In addition to fixing prices for Hermetic Compressors, Defendants also agreed to allocate market share.

74.  A further indication that Defendants were not vigorously competing against each other is the torpid manner in which they improved their products or responded to changing market conditions. According to an industry publication, "[c]ompared with air conditioning, the refrigeration industry has been slower with changes, both in terms of a shift towards scroll units, and also in terms of a shift towards efficiency and environmental protection."

## Structure and Characteristics of the Hermetic Compressors Market

75.  By its nature, the Hermetic Compressors market lends itself to price-fixing, thus tempting Defendants to engage in precisely the misconduct alleged herein.

**Commodity-Like Products**

76.     Within relevant categories, Hermetic Compressors are homogeneous, commodity-like products.   For example, "Compressor Cross-Reference" guides, which demonstrate the substitutability of one Defendants' Hermetic Compressors for those of other Defendants are available on the websites of numerous Defendants, including Defendants Danfoss and Tecumseh. The commodity-like nature of Hermetic Compressors is also exemplified by the significant aftermarket for replacement Hermetic Compressors in which most Defendants participate. Because Hermetic Compressors are commodity-like products, purchases are made largely, if not entirely, on price.

77.     Indeed, Tecumseh's own documents recognize that Hermetic Compressors were "highly commoditized."

78.     The Defendants were keenly aware of their products' geographic markets.   They knew, for example, that a significant number of the Hermetic Compressors sold for use in products purchased by end payors such as Plaintiffs and members of the Class were sourced from production facilities located outside of the United States.     Defendant Whirlpool acknowledged this fact in a 1997 submission to the Federal Trade Commission regarding the propriety of labeling refrigerators as being "Made in USA" despite containing compressors produced outside the United States.   In that submission Whirlpool stated that "the FTC should also know that the U.S. refrigerator industry MUST source a significant percentage of its compressors from abroad since there is insufficient domestic production of these parts" (emphasis in original).   Whirlpool went on to argue that if the FTC implemented rules barring refrigerators containing foreign-sourced compressors from being labeled as "Made in USA," "much of the U.S. refrigeration industry will be disqualified from making 'Made in USA' claims."

## Industry Concentration

79.     During the Class Period, Defendants controlled the relevant Hermetic Compressors market, both globally and in the United States.   High market concentration is another factor that is conducive to price-fixing.

80.     According to industry reports, Embraco holds approximately 40 percent of the R&F market, Panasonic approximately 35 percent, and Tecumseh controls approximately 20 percent.  The remainder of the market is controlled by ACC and several others.

81.     Defendants as a group have held a stable and dominant position in the United States market throughout the Class Period.  For instance, Tecumseh has identified the same five manufacturers, in addition to itself, as the major manufacturers of commercial and household refrigeration compressors in its 10-K filing in every year since at least 1996, the beginning of the Class Period.

82.     Throughout the Class Period, Defendants dominated the US market for relevant Hermetic Compressors enabling them to raise prices above competitive levels.

## Barriers to Entry

83.     There are substantial barriers to entry into the relevant Hermetic Compressors market.  A new entrant into the industry would encounter significant hurdles, including multi-million dollar start up costs associated with manufacturing plants and equipment, distribution infrastructure, skilled labor and sales force, and significant variable costs associated with raw materials, energy, and shipping.

**Demand Inelasticity**

84.     Because there are no close substitutes for the relevant Hermetic Compressors, demand is highly inelastic.  By allowing producers to raise prices without triggering customer substitution and lost sales revenue, inelastic demand facilitates collusion.

**Opportunity for Conspiratorial Communications**

85.     Defendants are members of several trade associations that provide opportunities to meet under the auspices of legitimate business.

86.     Defendants are members of Heating, Air-conditioning & Refrigeration Distributors International ("HARDI"), a trade organization for the heating, ventilating, air conditioning and refrigeration industry.

87.     A number of Defendants, including Danfoss, Embraco N.A., Panasonic NA, and Tecumseh, are members of the Air-Conditioning, Heating and Refrigeration Institute ("AHRI"), an Arlington, Virginia based trade association.  The AHRI holds regular quarterly and annual meetings at locations throughout the United States.  Such regularly scheduled trade association meetings provide the opportunity for participants in price-fixing conspiracies to meet, discuss and perform acts necessary for the operation and furtherance of the conspiracy under the guise of legitimate business contacts.

88.     Several Defendants, including ACC, Danfoss, Embraco, and Tecumseh, are also members of the Association of European Refrigeration Compressors and Control Manufacturers ("ASERCOM").

89.     In Brazil, Defendants belong to the Brazilian Association of Refrigeration, Air Conditioning, Ventilation and Heating ("ABRAVA").

90.     Throughout the Class Period, Defendants also participated in the International Trade Fair for Refrigerating and Air Conditioning ("IKK"), a commercial trade show in Germany that is now called Chillventa.

91.     Additionally, during the Class Period, Defendants regularly exchanged sensitive pricing and market allocation information in person and by phone.

### Government Antitrust Investigations

92.     In February 2009, antitrust authorities in Brazil, the European Union, and the United States launched a coordinated international investigation into potential price fixing of Hermetic Compressors.

### Brazil

93.     On February 17, 2009, Brazilian antitrust and law enforcement authorities conducted a series of dawn raids on the offices of a number of Hermetic Compressor manufacturers, as well as the residences of current or former officers of at least two of the Defendant companies.

94.     Brazilian authorities publicly confirmed these raids were part of a coordinated international investigation involving European and U.S. antitrust regulators into a global cartel that had existed for at least the past 12 years.

95.     The Brazilian raids came as part of an investigation that began in late 2008, when one of the participants in the Hermetic Compressor conspiracy, Tecumseh, applied for leniency in three separate jurisdictions, effectively blowing the whistle on its co-conspirators.

96.     Statements issued by Brazilian authorities described the cartel's participants as having "agreed, through their managers, to fix price increases and also exchange commercially sensitive information," and regulators disclosed that the conspiracy operated through e-mail and

telephone communications, as well as face-to-face meetings at hotels and restaurants, between the conspirators. The report noted that Defendants had been exchanging confidential information for over 12 years.

97.     In a public filing on February 19, 2009, Defendant Whirlpool confirmed that its Brazilian subsidiary, Embraco, had been raided by Brazilian antitrust regulators. Embraco settled with the Brazilian regulatory agency near the end of 2009 for approximately $57 million.

98.     Brazilian press reports state that, in addition to raiding Embraco's facilities, Brazilian antitrust and law enforcement authorities simultaneously raided the Sao Paulo apartment of Paulo F.M.O. Periquito – President of Whirlpool's Latin American operations from 1997 through 2007, and since 2007 the President of Whirlpool International – where investigators seized computers, laptops, and documents.

99.     The Brazilian press has reported that Brazilian antitrust and law-enforcement authorities raided the Sao Carlos home of Gerson Verissimo, who was President of Tecumseh Brasil until 2008.

100.     Tecumseh, which would later disclose that it had received amnesty from Brazilian authorities for admitting its role in the Hermetic Compressor cartel, confirmed in a statement on February 19, 2009 that it had received "a formal request for information from the Secretariat of Economic Law of the Ministry of Justice of Brazil" related to its investigation of the compressor industry.

101.     Additionally, Whirlpool confirmed in a February 19, 2009 filing with the Securities and Exchange Commission ("SEC"), that its Brazilian subsidiary, Embraco, had been raided by Brazilian authorities; that its Italian subsidiary, the headquarters of the company's European operations, had been raided by the EC; and that the Antitrust Division of the U.S.

Department of Justice had issued grand jury subpoenas and requests for "documents relating to an antitrust investigation of the global compressor industry."

102.    Upon information and belief, Panasonic's Brazilian operations, based in the Brazilian state of Sao Paulo, were also raided by Brazilian antitrust authorities as part of their investigation into the Hermetic Compressor cartel described herein.

### European Union

103.    The dawn raids by Brazilian authorities were soon followed by surprise raids initiated by the European Commission in Denmark, Germany, Austria, and Italy.

104.    The European Commission issued a statement following the raids confirming the "Commission has reason to believe that the companies concerned may have violated EC Treaty rules on restrictive business practices [. . .] which prohibit practices such as price fixing and customer allocation."

105.    Danfoss confirmed its headquarters in Nordborg, Denmark, as well as its primary compressor manufacturing facility in Flensburg, Germany, were raided by the European Commission.

106.    Whirlpool similarly confirmed its Italian subsidiary and the headquarters of the company's European operations were raided by the European Commission.

107.    Upon information and belief, ACC's Italian headquarters and Austrian compressors factory were also raided by the European Commission.

### United States

108.    On February 19, 2009, the U.S. Department of Justice confirmed that it was investigating "anti-competitive practices in the compressor industry" in cooperation with international antitrust authorities.

109.   Whirlpool and Tecumseh confirmed they received grand jury subpoenas from the Antitrust Division of the U.S. Department of Justice, and Tecumseh has stated the investigation was "related to a pricing issue."

110.   Danfoss stated that "several of Defoss's companies in the USA were visited by the American competition authority," noting that "the reason for the visits and the pending investigation is the suspicion of illegal pricing arrangements within the compressor market."

111.   On February 27, 2009, Panasonic confirmed its U.S. subsidiary, Defendant Panasonic NA, "has been contacted by the U.S. government about an investigation relating to compressor pricing."

### Tecumseh's Amnesty Entry

112.   On February 23, 2009, in a memorandum from President and CEO Ed Burker to all employees, Tecumseh admitted the cartel's existence.  According to an internal memorandum of Tecumseh from Tecumseh's President, Chairman, and CEO:

> "In mid-2008 we were made aware of certain activities that appeared to have occurred in prior years that did not appear to conform to our policies and standards of ethical conduct.  Upon discovering these acts, the Company commenced an internal investigation led by independent outside counsel and directed by the Audit Committee of the Board of Directors.  We also promptly brought the matter to the attention of authorities, and we have been cooperating with them in further information gathering.  As a result of this action, we entered into amnesty agreements in the U.S., Brazilian and European jurisdictions.  These agreements, which are conditioned on factors that include our continued cooperation with authorities, should protect the company from governmental fines and penalties that could result if the reported conduct is found to violate applicable law in such jurisdictions." (emphasis added).

113.   To be granted amnesty from regulators in the U.S., Europe and Brazil, Tecumseh was required to admit to its complicity in the conspiracy alleged herein, and to provide

information to global competition authorities confirming the identities, roles and activities of its co-conspirators.

114.    According to U.S. Department of Justice guidelines, a corporate amnesty applicant must "admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. A company that argues that an agreement to fix prices, rig bids, restrict capacity or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency."

115.    Similarly, in order to be granted leniency by the European Commission – which can result in either total immunity from, or a reduction of, fines assessed for anti-competitive conduct – a company that participated in a cartel "must provide evidence that enables the Commission to prove the cartel infringement."

116.    To be granted leniency from Brazil's Ministry of Justice, Secretariat of Economic Law, an applicant must furnish authorities with an "admission of participation in the anticompetitive practice" and offer a "complete description of the anticompetitive practice, including the identification of the other participants and the respective individual roles."

## EFFECTS OF THE CONSPIRACY

117.    The market for Hermetic Compressors used in the commercial and household refrigeration market is inextricably linked with the market for commercial and household refrigeration products themselves. The relevant Hermetic Compressors exist to be incorporated

into end products such as refrigerators and water coolers, without which the end products themselves would not function. Put simply, without the Hermetic Compressors that are installed, unaltered, these end products would be little more than storage boxes.

118.    Plaintiffs and Class Members effectively participate in the market for Hermetic Compressors through their end-payor purchases of Hermetic Compressors and products containing Hermetic Compressors. The Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have purchased Defendants' Hermetic Compressors and products containing them, and Plaintiffs and the members of the End-Payor-Purchaser Classes alleged herein, have been injured thereby.

119.    To the extent Plaintiffs and end-payor purchasers bought Hermetic Compressors as part of a refrigeration device or freezer, Defendants' unlawful conspiracy inflated the prices at which OEMs resold the Hermetic Compressors as part of the products purchased by plaintiffs. In essence, Defendants have extinguished the market forces of competition to their mutual benefit and consumers, including Plaintiffs, have been injured by paying supra-competitive prices for products containing the relevant Hermetic Compressors.

120.    Thus, Defendants' unlawful actions have had at least the following effects:

(a)    Prices paid by Plaintiffs and the members of the Class for the relevant Hermetic Compressors and products containing the relevant Hermetic Compressors were fixed, stabilized, and/or maintained at supra-competitive levels in the United States and each of its states and territories;

(b)    Customers and markets for Hermetic Compressors were allocated among Defendants and their co-conspirators;

(c)    Plaintiffs and the other members of the Class paid more for Hermetic Compressors and/or products they purchased that contain Hermetic Compressors than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive activities;

(d)    Price competition regarding the sale of the relevant Hermetic Compressors was restrained, suppressed, and/or eliminated in the United States and each of its states and territories, thus raising the prices of Hermetic Compressors and products containing the relevant Hermetic Compressors above the prices absent the Defendants' actions; and

(e)    As a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

## **FRAUDULENT CONCEALMENT**

121.    Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until February 18, 2009, when the global investigation was first publicly reported.

122.    Because Defendants' agreements, understandings, and conspiracies were kept secret until February 18, 2009, Plaintiffs and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for products that use Hermetic Compressors during the Class Period.

26

123.   Defendants' acts in furtherance of the conspiracy were concealed and carried out in a manner that precluded detection.

124.   Defendants' acts of concealment, which were effective in keeping the OEMs in the dark, were more than sufficient to preclude suspicion by end-payor purchasers. Accordingly, a reasonable person under the circumstances would not have been alerted to Defendants' conspiracy before February 18, 2009.

125.   Because of the deceptive practices and techniques employed by Defendants and their coconspirators to avoid detection, Plaintiffs and members of the Class could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

126.   Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until February 18, 2009, when reports of the investigations into anti-competitive conduct concerning Hermetic Compressors were first publicly disseminated.

127.   None of the facts or information available to Plaintiffs and members of the Class if investigated with reasonable diligence, would have led to the discovery of the conspiracy alleged herein prior to February 18, 2009.

128.   Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Hermetic Compressors, which they affirmatively concealed, at least in the following respects:

(a)     By meeting and communicating secretly to discuss prices and customers of

Hermetic Compressors in the U.S. and throughout the world, including through e-

mail and telephonic communications as well as at meetings at hotels and restaurants;

(b)     By agreeing among themselves not to discuss publicly, or otherwise reveal,

the nature and substance of the acts and communications in furtherance of their

unlawful scheme; and

(c)     By stating in public filings with the Securities and Exchange Commission, among

other things, that: the compressors industry is "highly competitive"; compressors

manufacturers "compete on the basis of product design, quality, availability,

performance, customer service and price"; and other Defendants named herein

were competitors in the compressors industry.

129.    By reason of the foregoing, the running of any statute of limitations has been tolled

with respect to the claims that Plaintiffs and members of the Class have alleged in this

Complaint.

## CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action on behalf of themselves and as a class action under the

provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the

following Class:

> All persons and entities that purchased Hermetic compressors
> ("Hermetic Compressors") or products that contained Hermetic
> Compressors as an end payor, and not for resale, in the states of
> Arizona, Arkansas, California, District of Columbia, Florida, Hawaii,
> Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota,
> Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New
> York, North Carolina, North Dakota, Puerto Rico, Rhode Island, South
> Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin at
> any time from January 1, 1996 through December 31, 2009 from any

Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities, persons who purchased Hermetic Compressors directly, and persons who purchased Hermetic Compressors indirectly for resale.

131.    In the alternative, Plaintiffs may seek the certification of subclasses.

132.    Plaintiffs do not know the exact number of Class members. But due to the nature of the trade and commerce involved, Plaintiffs believe that there are (at least) thousands of Class members.

133.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

134.    There are numerous questions of law and fact common to the Class, including:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Hermetic Compressors sold in the United States;

(b)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers or markets for Hermetic Compressors sold in the United States;

(c)    The identity of the participants of the alleged conspiracy;

(d)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)    Whether the alleged conspiracy violated the various state antitrust statutes as alleged in Count I;

(f)    Whether the alleged conspiracy violated the various state consumer protection and unfair competition statutes as alleged in Count II;

(g)    Whether Defendants unjustly enriched themselves to the detriment of the Class, thereby entitling Plaintiffs and the other Class members to disgorgement of all benefits derived therefrom, as alleged in Count III;

(h)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Class;

(i)    The effect of the alleged conspiracy on the prices of Hermetic Compressors, and products that use Hermetic Compressors, sold in one or more of the Class Jurisdictions during the Class Period;

(j)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the other members of the Class; and

(k)    The appropriate class-wide measure of damages.

135.    These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

136.    Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws in that they paid artificially inflated prices for Hermetic Compressors or products that contain Hermetic Compressors purchased as end payors from Defendants or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the

other Class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

137.   Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

138.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

139.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## VIOLATIONS ALLEGED

### Count I – Violation of State Antitrust Statutes

140.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this complaint.

141.   From as early as January 1, 1996 through December 31, 2009, Defendants and their coconspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Hermetic Compressors in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes outlined below.

142.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain at artificially supra-competitive prices for Hermetic Compressors, and to allocate customers for Hermetic Compressors in the United States.

143.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)    participating in meetings and conversations among themselves during which they agreed to price Hermetic Compressors at certain levels, and otherwise to fix, increase, maintain, or stabilize effective prices paid by Plaintiffs and members of the Class with respect to Hermetic Compressors sold in the United States;

(b)    allocating customers and markets for Hermetic Compressors in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves to implement, adhere to and police the agreements they reached.

144.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Hermetic Compressors.

145.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

146.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Stat. § 44-1401, *et seq*.

147.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

148.   Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code Ann. § 28-4503, *et seq.*

149.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Rev. Stat. § 480-1, *et seq.*

150.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.*

151.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. § 50-101, *et seq.*

152.   Defendants have entered into an unlawful agreement in restraint of trade in violation of La. Rev. Stat. Ann. § 51:137, *et seq.*

153.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.*

154.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws Ann. § 445.772, *et seq.*

155.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.52, *et seq.*

156.   Defendants have entered into an unlawful agreement in restrain of trade in violation of Miss. Code Ann. § 75-21-1, *et seq.*

157.   Defendants have entered into an unlawful agreement in restrain of trade in violation of Neb. Rev. Stat. § 59-801, *et seq.*

158.   Defendants have entered into an unlawful agreement in restrain of trade in violation of N.H. Rev. Stat. § 356:1, *et seq.*

159.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A., *et seq.*

160.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

161.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

162.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. § 75-1, *et seq.*

163.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.*

164.   Defendants have entered into an unlawful agreement in restraint of trade in violation of 10 P.R. Laws Ann. § 257, *et seq.*

165.   Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.*

166.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq.*

167.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. § 76-10-911, *et seq.*

168.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Vt. Stat. Ann. 9 § 2453, *et seq.*

169.   Defendants have entered into an unlawful agreement in restraint of trade in violation of W.Va. Code § 47-18-1, *et seq.*

170.   Defendants have entered into an unlawful agreement in restraint of trade in

violation of Wis. Stat. § 133.01, *et seq.*

171.    Plaintiffs and Class members in each of the above states, territories and the District of Columbia have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Class have paid more for Hermetic Compressors and products containing Hermetic Compressors than they otherwise would have paid in the absence of Defendants' conduct.  This injury is of the type the antitrust laws of the above states, territories, and District of Columbia were designed to prevent and flows from that which makes Defendants' conduct unlawful.  Accordingly, Plaintiffs and Class members in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above antitrust laws.

### Count II – Violation of State Consumer Protection and Unfair Competition Statutes

172.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this complaint.

173.    Defendants have engaged in unfair competition or unfair, deceptive, and/or unconscionable acts or practices in violation of the following state consumer protection and unfair competition statutes.  These violations were willful, knowing, and made in bad faith.

174.    Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*

175.    Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

176.    Defendants have engaged in unfair competition and unfair or deceptive acts or

practices or made false representations in violation of D.C. Code § 28-3901, *et seq.*

177.   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*

178.   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*

179.   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

180.   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*

181.   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, *et seq.*

182.   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

183.   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6 13.1-1, *et seq.*

184.   Defendants have engaged in unfair competition and unfair, deceptive or fraudulent acts or practices in violation of Wisc. Stat. § 100.20, *et seq.*

185.   Plaintiffs and Class members in each of the above states and the District of Columbia have been injured in their business and property by reason of Defendants' anticompetitive and/or unfair acts.  Plaintiffs and members of the Class paid more for Hermetic Compressors and products containing Hermetic Compressors than they otherwise would have paid absent the unlawful conduct alleged herein.  This injury is of the type the state consumer protection and unfair competition statutes were designed to prevent and directly results from

Defendants' unlawful conduct.  Accordingly, Plaintiffs and members of the Class in each of the states listed above seek all appropriate relief as provided for by the laws of those states, including but not limited to statutory damages, and actual damages (to be trebled or otherwise increased as permitted), injunctive relief, reasonable attorneys fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

### <u>Count III –Unjust Enrichment</u>

186.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

187.   By reason of their unlawful conduct, Defendants should make restitution to Plaintiffs and the Class.

188.   Defendants have benefited from their unlawful acts through the overpayments for Hermetic Compressors and products containing Hermetic Compressors by Plaintiffs and the other members of the Class and the increased profits resulting from such overpayments.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments that were conferred by Plaintiffs and the Class and retained by Defendants.

189.   Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiffs and the other Class members may make claims on a *pro rata* basis for restitution.

### <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be certified as class representatives and that Plaintiffs' counsel be appointed as counsel for the Class;

(2)    That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed to be a violation of the state antitrust laws as alleged in Count I;

(3)    That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed to be a violation of the state consumer protection and unfair competition laws as alleged in Count II;

(4)    That Defendants be found to have been unjustly enriched by their unlawful conduct as alleged in Count III and ordered to disgorge the profits each received as a result of their unlawful conduct;

(5)    That Plaintiffs and the Class recover damages, as provided by the state antitrust laws and state consumer protection and unfair competition laws, and that a joint and several judgment be entered in favor of Plaintiffs and the Class and against Defendants in an amount to be trebled or otherwise increased in accordance with such laws;

(6)    That Plaintiffs and the relevant Class members obtain any statutory damages, penalties, punitive, or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

(7)    That Plaintiffs and the relevant Class members recover damages and/or all other available monetary and equitable remedies under the state consumer protection and/or unfair competition laws identified above;

(8)    That Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

(9)    That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

(10)    For such other and further relief as is just under the circumstances.


Dated:  June 30, 2010

/s/ David E. Plunkett
David E. Plunkett (P66696)
Richard E. Rassel  (P57540)
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
380 N. Old Woodward Avenue, Suite 300
Birmingham, Michigan  48009
Telephone: (248) 642-0333

*Interim Lead Counsel*
*for the Indirect Purchaser Class*


-and-


Eric J. Pickar
BANGS, MCCULLEN, BUTLER, FOYE &
SIMMONS, LLP
333 West Boulevard, Suite 400
P.O. Box 2670
Rapid City, South Dakota 57709
Telephone: (605) 343-1040
Facsimile: (605) 343-1503
epickar@bangsmccullen.com

Manfred P. Muecke
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
600 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 756-7748
Facsimile: (602) 274-1199
mmuecke@bffb.com

Andrew S. Friedman
Francis J. Balint
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
afriedman@bffb.com
fbalint@bffb.com

Van Bunch
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
57 Carriage Hill
Signal Mountain, Tennessee  37377
Telephone: (423) 580-5342
vanb@earthlink.net

Daniel E. Birkhaeuser
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Walnut Grove Road, Suite 120
Walnut Creek, California 94598
Telephone: (925) 945-0200
dbirkhaeuser@bramsonplutzik.com

J. Douglas Richards
Seth Gassman
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, Fourteenth Floor
New York, New York 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745
drichards@cohenmilstein.com
sgassman@cohenmilstein.com

Emmy L. Levens
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500 West
Washington, DC 20005
Telephone: (202) 408-3669
Facsimile: (202) 408-4699
elevens@cohenmilstein.com

Jeffrey P. Thennisch
DOBRUSIN & THENNISCH PC
29 W Lawrence Street, Suite 210
Pontiac, Michigan 48342
Telephone: (248) 292-2920
jeff@patentco.com

Michael G. Simon
FRANKOVITCH, ANETAKISM COLANTONIO &
SIMON
337 Penco Road
Weirton, West Virginia 26062
Telephone: (304) 723-4400
Facsimile: (304) 723-5892
msimon@facslaw.com

Jeffrey A. Bartos
GUERRIERI, EDMOND, CLAYMAN & BARTOS,
P.C.
1625 Massachusetts Avenue, NW, Suite 700
Washington, DC 20036
Telephone: (202) 624-7400
Facsimile: (202) 624-7420
jbartos@geclaw.com

John D. Mills
LAW OFFICE OF JOHN D. MILLS, P.A
1415 Dean Street, Suite 105
Fort Myers, Florida 33901
Telephone: (239) 337-3535
Facsimile: (239) 337-3499
jdmlaw@att.net

Jon Adams
LAW OFFICES OF JON ADAMS
417 Riverside Drive, Suite 5F
New York, New York 10025
Telephone: (917) 842-2595
jonlawyer@gmail.com

Joseph M. Barton
LAW OFFICES OF JOSEPH M. BARTON
628 Manzanita Avenue
Corte Madera, California 94925
Telephone: (415) 235-9162
joebartonesq@gmail.com

Joseph M. Patane
LAW OFFICES OF JOSEPH M. PATANE
2280 Union Street
San Francisco, California 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
jpatane@tatp.com

Lance C. Young
LAW OFFICE OF LANCE C. YOUNG
43311 Joy Road #244
Canton, Michigan 48187
Telephone: (734) 446-6932
Facsimile: (734) 446-6937
younglcy@hotmail.com

Sherman Kassof
LAW OFFICES OF SHERMAN KASSOF
954 Risa Road, Suite B
Lafayette, California 94549
Telephone: (510) 652-2554
Facsimile: (510) 652-9308
heevay@att.net
heevay@yahoo.com

Matthew S. Wild
WILD LAW GROUP, PLLC
Harrison, New York 10528
Telephone: (914) 358-6443
mwild@wildlawgroup.com

James D. Linnan
LINNAN & FALLON, LLP
61 Columbia Street, Suite 300
Albany, New York 12210
Telephone: (518) 449-5400
Facsimile: (518) 449-5262

Milene Mansouri
MILENE MANSOURI, ESQ., PC
108-18 Queens Blvd.,
6th Floor, Suite 6
Forest Hills, New York 11375
Telephone: (718) 793-2426
Facsimile: (718) 793-2426

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
Telephone: (312) 332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

John M. Perrin
THE PERRIN LAW FIRM
27735 Jefferson Avenue
Saint Clair Shores, Michigan 48081
Telephone: (586) 773-9500
Facsimile: (586) 773-3475
johnmperrin@sbcglobal.net

Michael M. Buchman
POMERANTZ HAUDEK BLOCK GROSSMAN &
GROSS LLP
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
mbuchman@pomlaw.com

Marc G. Reich, Esq.
REICH RADCLIFFE & KUTTLER LLP
4675 MacArthur Court, Suite 550
Newport Beach, California 92660
Telephone: (949) 975-0512
Facsimile: (949) 975-0514
mgr@reichradcliffe.com

Susan LaCava
LACAVA & LIEF, S.C.
23 North Pinckney Street, Suite 300
Madison, Wisconsin 53703
Telephone: (608) 258-1335
Facsimile: (608) 258-1669
lacava@2llaw.com

Marshall J. Widick
Andrew Nickelhoff
SACHS WALDMAN, P.C.

1000 Farmer Street
Detroit, Michigan 48226
Telephone: (313) 965-3464
Facsimile: (313) 965- 4602
mwidick@sachswaldman.com
anickelhoff@sachswaldman.com

Charles E. Tompkins
Rob E. Ditzion
SHAPIRO HABER & URMY LLP
53 State Street
Boston, Massachusetts  02109
Telephone: 617-439-3939
Facsimile: 617-439-0134
ctompkins@shulaw.com
rditzion@shulaw.com

Isaac Diel
SHARP MCQUEEN P.A.
Financial Plaza
6900 College Boulevard Suite 285
Overland Park, Kansas 66211
Telephone: (913) 661-9931
Facsimile:  (913) 661-9935
idiel@sharpmcqueen.com

Timothy D. Battin
Shinae Kim-Helms
Thomas Palumbo
STRAUS & BOIES, LLP
4041 University Drive, 5th Floor
Fairfax, Virginia 22030
Telephone: (703) 764-8700
Facsimile: (703) 764-8704
iotto@straus-boies.com
tbattin@straus-boies.com
jraynes@straus-boies.com

Mark Schirmer
STRAUS & BOIES, LLP
1661 International Drive, Suite 400
Memphis, Tennessee 38120
Telephone: (901) 818-3146
mschirmer@straus-boies.com

Mario N. Alioto
Lauren C. Russell
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, California 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

Eric D. Barton
Tyler W. Hudson
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Telephone: (816) 701-1100
Facsimile: (816) 531-2372
ebarton@wcllp.com
thudson@wcllp.com

James F. Wyatt, III
WYATT & BLAKE, LLP
435 East Morehead Street
Charlotte, North Carolina 28202
Telephone: (704) 331-0767
Facsimile: (704) 331-0773
jfw@wyattlaw.net

David W. Zoll
Michelle L. Kranz
ZOLL KRANZ & BORGESS
6620 W. Central Avenue, Suite 200
Toledo, Ohio 43617
Telephone: (419) 841-9623
david@toledolaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2010, I caused the foregoing Consolidated Amended Complaint to be filed with the Court using the ECF system, which will send notification to all counsel of record.

_____/s/ David E. Plunkett_____
David E. Plunkett
