UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re: Refrigerant Compressors            Case No. 2:09-md-02042
Antitrust Litigation

                                          Honorable Sean F. Cox

_____/

**OPINION & ORDER**
**ON "DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS**
**BY DIRECT PURCHASER PLAINTIFFS" (DOCKET ENTRY NO. 164)**

        This matter is before the Court on "Defendants' Joint Motion to Dismiss Claims by

Direct Purchaser Plaintiffs" (Docket Entry No. 164).  The parties have fully briefed the issues

and the Court heard oral argument on May 26, 2011.  For the reasons set forth below, the Court

shall:

   1)    Rule that the only persons or entities that have standing to assert federal
         antitrust claims in this action are those persons or entities who directly
         purchased compressors from a Defendant;

   2)    Deny Defendants' request to dismiss claims prior to June 2004, or after
         December 2006, under *Twombly;*

   3)    Defer decision on Defendants' challenge based on the Foreign Trade
         Antitrust Improvements Act because the Court cannot meaningfully
         address that argument until after an amended complaint is filed; and

   4)    Rule that Direct Purchaser Plaintiffs have not pleaded fraudulent
         concealment with the requisite particularity and, therefore, they cannot
         recover any damages incurred prior to February 25, 2005.

Thus, the Court shall grant the motion in part, defers decision on one ground for dismissal until

after an amended complaint has been filed, and shall deny the motion in part.

1

**BACKGROUND**

Beginning in February 2009, Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs filed complaints in various jurisdictions asserting claims against Defendants.  Those actions were consolidated for pretrial proceedings by the United States Judicial Panel on Multidistrict Litigation.

The Indirect Purchaser Plaintiffs' complaints have since been combined in a Second Consolidated Amended Complaint, which seeks certification of a nationwide class, and asserts state-law antitrust claims, consumer protection / unfair competition claims, and unjust enrichment claims.

The Direct Purchaser Plaintiffs' ("DP Plaintiffs") complaints have been combined in a Master Amended Complaint ("MAC") which seeks class action certification and asserts federal antitrust claims.  The DP Plaintiffs' MAC is the subject of the pending motion.

DP Plaintiffs filed their MAC on June 30, 2010.  (Docket Entry No. 155).  DP Plaintiffs "bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, including treble damages," for injuries sustained by plaintiffs and the Class resulting from Defendants' alleged violation of the Sherman Act, 15 U.S.C. §1.  (MAC at ¶ 6).

The MAC states that this action is brought on behalf of plaintiffs and all individuals and entities that purchased "Refrigerant Compressor Products" directly from one or more Defendants "during the period from and including January 1, 2004 up to and including December 31, 2008 (the 'Class Period')."  (MAC at ¶ 1).  DP Plaintiffs seek to have the following class certified:

> All persons or entities (but excluding government entities and defendants, their
> officers, directors, and employees, as well as defendants' parents, predecessors,
> successors, subsidiaries, affiliates) who purchased *Refrigerant Compressor*

2

*Products* in the United States, its territories or possessions, directly from any defendant, or from any of their parents, predecessors, successors, subsidiaries, or affiliates, at any time during the period from and including January 1, 2004 up to and including December 31, 2008. "Refrigerant Compressor Products" are compressors of less than one horsepower ("Compressors"), as well as products containing such Compressors.  Compressors does not include compressors used in air conditioners, and Refrigerant Compressor Products does not include air conditioners.

(MAC at ¶ 47) (emphasis added).  "The Class definition encompasses those who brought a Refrigerant Compressor Product directly from a defendant, even if the Compressor contained therein was manufactured by an affiliated entity, principal, agent, or co-conspirator."  (MAC at ¶ 48).

The MAC defines "Refrigerant Compressor Products" as "fractional compressors, that is, compressors of less than one horsepower ('Compressors'), *as well as products, containing such Compressors*."  (MAC at ¶ 1) (emphasis added).   "Fractional compressors (meaning those less than one horsepower), which are the Compressors at issue [in this case], are used for refrigeration purposes or in refrigeration products, such as, among others, condensers, residential and commercial refrigerators, freezers and water coolers."  (MAC at ¶ 59).  "Compressors" and "Refrigerant Compressor Products," as defined by DP Plaintiffs in the MAC, do not include compressors used in air conditioners or air conditioners.  (MAC at ¶ 1).

DP Plaintiffs allege that Defendants "conspired to inflate, fix, raise, maintain, or artificially stabilize prices and to commit other anti-competitive acts for the purpose and effect of unlawfully inflating, fixing, raising, maintaining, or artificially stabilizing *prices of Compressors*, which had the effect of unlawfully inflating, fixing, raising, maintaining, or artificially stabilizing prices of Refrigerant Compressor Products."  (MAC at ¶ 3) (emphasis added).   DP Plaintiffs

allege that Defendants "have engaged in a wide-ranging conspiracy during the Class Period to

raise, fix, maintain or stabilize the price of Compressors sold in the United States and

elsewhere," and that "[i]ncreases in the prices for Compressors increased the prices for

Refrigerant Compressor Products."  (MAC at ¶¶ 60-61).  The MAC alleges that Defendants

carried out the alleged antitrust conspiracy "through regular, secret meetings and

communications throughout the entire Class Period, during which the prices of Compressors, as

well as other market information relating to Compressors, were discussed and exchanged."

(MAC at ¶ 62).

There are six named DP Plaintiffs in the MAC: 1) Appliance Parts Distributors, Inc.

("APD"); 2) B & B Appliance Parts of Mobile, Inc. ("B & B"); 3) OK TV & Appliances, LLC

("OK TV"); 4) Sanden Vendo America, Inc. ("Sanden Vendo"); 5) The Mitchell Company, Inc.

("Mitchell"); and 6) Wettstein and Sons, Inc. ("Wettstein").  (MAC at ¶¶ 12-17).  For each of the

named DP Plaintiffs, the MAC alleges that entity "purchased Refrigerant Compressor Products

directly from one or more defendants," without specifying whether that entity purchased

compressors, or products containing compressors, and without specifying the Defendant(s) from

whom the entity purchased.  (Id.).  The MAC also fails to specify where or when each named DP

Plaintiff purchased the Refrigerant Compressor Products.

There are sixteen named Defendants in the MAC:   1) Tecumseh Products Company; 2)

Tecumseh Compressor Company; 3) Tecumseh do Brasil, Ltda.; 4) Tecumseh do Brasil USA,

LLC; 5) Whirlpool Corporation; 6) Whirlpool S.A.; 7) Embraco North America, Inc.; 8) Danfoss

A/S; 9) Danfoss, Inc.; 10) Danfoss Commercial Compressors, Ltd.; 11) Danfoss Scroll

Technologies, LLC f/k/a Scrolll Technologies, LLC; 12) Danfoss Turbocor Compressors, Inc.;

13) Appliances Components Companies SpA; 14) ACC USA, LLC; 15) Panasonic Corporation f/k/a Matsushita Electric Industrial Co., Ltd.; and 16) Panasonic Corporation of North America.

The pending Joint Motion to Dismiss is brought by all of the above Defendants, with the exception of the following Defendants:  Tecumseh Products Company, Tecumseh Compressor Company, Tecumseh do Brasil, Ltda., and Tecumseh do Brail USA ("the Tecumseh Defendants").  The MAC alleges that each of the Moving Defendants manufactured, marketed or sold  "Refrigerant Compressor Products in the United States," without specifying whether that entity manufactured, marketed or sold compressors or products containing compressors.  (MAC at ¶¶ 18-38).

## LEGAL STANDARD

The instant motion is brought pursuant to FED. R. CIV. P. 12(b)(1), lack of subject-matter jurisdiction, and FED. R. CIV. P. 12(b)(6), failure to state a claim for upon which relief can be granted.

Where subject matter jurisdiction is challenged pursuant to FED. R. CIV. P. 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.  *Moir v. Greater Cleveland Regional Transit Authority*, 895 F.2d 266, 269 (6th Cir. 1990).

When ruling on a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff and accept all the well-pleaded factual allegations as true.  *Evans-Marshall v. Board of Educ.*, 428 F.3d 223, 228 (6th Cir. 2005).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1948 (2009).  Although a heightened fact pleading of specifics is not required, the plaintiff must

bring forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).

## ANALYSIS

The Moving Defendants filed their Joint Motion to Dismiss on August 30, 2010 (Docket Entry No. 164), in order to assert challenges to the DP Plaintiffs' MAC that are common to all of them. Each of those challenges is discussed below.

## I.    Federal Antitrust Standing

Defendants claim that, under existing Supreme Court authority, *Illinois Brick* and *Utilicorp*, the so-called "Direct Purchaser" Plaintiffs in this action lack standing to seek damages under the federal antitrust laws because they do not allege that they are direct purchasers of compressors, the product that was the subject of the alleged conspiracy. *Illinois Brick v. Illinois*, 431 U.S. 720 (1977)*; Kansas v. Utilicorp United, Inc.,* 497 U.S. 199 (1990).

In their response, DP Plaintiffs assert that "certain[1] of the named [DP] Plaintiffs purchased Compressors directly from Defendants," while "others purchased products containing Compressors" from Defendants. (Pls.' Resp. Br., Docket Entry No. 197, at 2). They take the position that both groups have federal antitrust standing.

As to those unidentified named DP Plaintiffs who did not purchase compressors from

---

[1]DP Plaintiffs' brief does not identify which named DP Plaintiffs allegedly purchased compressors from Defendants. At the hearing, Counsel for DP Plaintiffs asserted that three of the named DP Plaintiffs directly purchased compressors from a Defendant.

Defendants, but did purchase products containing compressors, they claim those entities have standing because "[direct purchasers from a conspirator of products containing a price-fixed component have standing under the United States antitrust law.]" (*Id*. at 4).  In support of this second argument, DP Plaintiffs assert that Defendants "fail to acknowledge the federal antitrust cases most directly on point, which analyze price-fixing of an input in an integrated product. Several courts have confronted situations where plaintiffs directly purchased 'finished' goods from one or more members of a cartel of manufacturers who also made, and fixed the price of, a component of those goods."  (Pls.' Br. at 4).  DP Plaintiffs rely primarily on two cases:  *In re Sugar Industry Antitrust Litig*., 579 F.2d 13 (3d Cir. 1978) and *In re Linerboard Antitrust Litig*., 305 F.3d 145 (3d Cir. 2002).

As to those unidentified named DP Plaintiffs who did purchase compressors directly from a Defendant, DP Plaintiffs contend that it is undisputed that group has standing.  (Pls.' Br. at 4 n.5).

**A.     Only Those Persons Or Entities Who Directly Purchased Compressors From A Defendant Have Federal Antitrust Standing In This Action.**

In *Hanover Shoe,* Hanover Shoe, Inc. alleged that United Shoe Machinery Corp. had monopolized the shoe manufacturing machinery industry, in violation of the Sherman Act, and sought treble damages under the Clayton Act[2] for overcharges paid in leasing certain machinery from United.  *Hanover Shoe, Inc. v. United Shoe Machinery Corp*., 392 U.S. 481 (1968). "United defended, in part, on the ground that Hanover had passed on the overcharge to its customers and,

---

[2]Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizes any person injured by a violation of the antitrust laws to sue for treble damages, costs, and attorney fees.

as a result, had suffered no injury." *Utilicorp ,* 497 U.S. at 206.  The Supreme Court "rejected

the defense for two reasons.  First, noting that a wide range of considerations may influence a

company's pricing decisions, [it] concluded that establishing the amount of an overcharge shifted

to indirect purchasers 'would normally prove insurmountable.'" *Id.* at 206-207 (quoting *Hanover*

*Shoe, supra,* at 493).  Second, the Court "reasoned that a pass-on defense would reduce the

effectiveness of § 4 actions by diminishing the recovery available to any potential plaintiff."

*Utilicorp*, 497 U.S. at 207.

   In *Illinois Brick*, the Supreme Court considered the question of whether an *offensive* use

of a pass-on theory is consistent with *"Hanover Shoe's* restrictions on the defensive use of pass-

on." *Illinois Brick*, 431 U.S. at 728.  The Court held that *it is not* and ruled "that the overcharged

direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured

in his business or property' within the meaning" of Section 4 of the Clayton Act.  *Id.* at 729.  In

other words, the Court declined to construe Section 4 of the Clayton Act "to permit offensive use

of a pass-on theory against an alleged violator that could not use the same theory as a defense in

an action by direct purchasers."

   In that case, the State of Illinois and various local governmental entities sued Illinois

Brick Company and other concrete block manufacturers for conspiring to raise the costs of

concrete blocks.  The governmental entities brought that action under the Clayton Act, alleging

that the concrete block manufacturers had engaged in a combination and conspiracy to fix the

prices of concrete block in violation of the Sherman Act.

   The concrete blocks were the subject of the alleged antitrust conspiracy.  The concrete

blocks were purchased directly from the concrete block manufacturers "by masonry contractors

and used by them to build masonry structures; those structures are incorporated into entire buildings by general contractors and sold to" the governmental entities. *Id*. at 726.

The complaint alleged that the amounts paid by the governmental entities "for concrete block were more than $3 million higher by reason of this price-fixing conspiracy. The only way in which the antitrust violation alleged could have injured" the governmental entities is via a pass-on theory (i.e., if all or part of the overcharge was passed on by the masonry and general contractors to the governmental entities rather than being absorbed by them). *Id*. at 727. Having rejected the offensive use of a pass-on theory, the Court ruled that the governmental entities had suffered no antitrust injury within the meaning of § 4 because Illinois Brick had not sold any concrete blocks to them.

The *Illinois Brick* Court declined to allow the offensive use of a pass-on theory for several reasons. First, the Court concluded that allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants. *Illinois Brick*, 431 U.S. at 730-31.

Second, the Court concluded that "the reasoning of *Hanover Shoe* cannot justify unequal treatment of plaintiffs and defendants with respect to the permissibility of pass-on arguments," explaining:

> The principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions 'in the real economic world rather than an economist's hypothetical model,' 392 U.S., at 493, 88 S.Ct., at 2231 and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom. This perception that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings applies with no less force to the assertion of pass-on

> theories by plaintiffs than it does to the assertion by defendants. However 'long and complicated' the proceedings would be when defendants sought to prove pass-on, ibid., they would be equally so when the same evidence was introduced by plaintiffs. Indeed, the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution.

*Illinois Brick*, 431 U.S. at 732.  In other words:

> Permitting the use of pass-on theories under s 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers.  However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

*Id.* at 737.  Thus, the *Illinois Brick* Court understood *Hanover Shoe* "as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it."  *Id*. at 735.

The respondents in *Illinois Brick* argued, with some support from lower courts, "that pass-on theories should be permitted for middlemen that resell goods without altering them."  *Id.* at 743.  The *Illinois Brick* Court, however, rejected the attempt "to carve out exceptions to the *Hanover Shoe* rule for particular types of markets."  *Id.* at 744.

In *Utilicorp*, the Supreme Court reaffirmed the direct purchaser rule set forth in *Hanover Shoe* and *Illinois Brick* and again declined to carve out exceptions to it.  In that case, the plaintiff utilities sued a pipeline company and several gas producers under § 4 of the Clayton Act, alleging that defendants had unlawfully conspired to inflate the price of the gas they supplied to the

utilities, and sought treble damages for both the amount overcharged and the decrease in sales to customers caused by the overcharge. The petitioner states then filed separate § 4 actions against those same defendants for the same alleged antitrust violations, on behalf of state residents who purchased gas from the utilities. The actions were consolidated and the trial court dismissed the claims asserted by the states on behalf of the resident customers because, under *Hanover Shoe* and *Illinois Brick*, the utilities had suffered antitrust injury as direct purchasers of gas but their customers, as indirect purchasers, had not.[3] The Court of Appeals affirmed.

The Supreme Court also affirmed, noting that like the governmental entities in *Illinois Brick*, "the consumers in this case have the status of indirect purchasers. In the distribution chain, they are not the immediate buyers from the alleged antitrust violators. They bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of gas. Unless we create an exception to the direct purchaser rule established in *Hanover Shoe* and *Illinois Brick,* any antitrust claim against the defendants is not for them, but for the utilities to assert." *Utilicorp*, 497 U.S. at 207.

The petitioner urged the Court to adopt an exception to the direct purchaser rule, asserting that none of the rationales underlying *Hanover Shoe* or *Illinois Brick* existed in the case. The Court declined to carve out an exception to the direct purchaser rule. In doing so, the Court explained that "[t]he rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of

---

[3]The only way that the alleged antitrust violation could have injured the utilities' customers is via an offensive pass-on theory (i.e., if all or part of the overcharge for the gas was passed on by the utilities to their customers).

markets.'  *Illinois Brick*, 431 U.S., at 744, 97 S.Ct., at 2074.  *The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule.*"  *Id.* at 216 (emphasis added).  Thus, the Court concluded that "even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions.  Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4" of the Clayton Act.  *Id.* at 217.

Here, DP Plaintiffs seek to avoid the direct purchaser rule and the Supreme Court's rejection of an offensive pass-on theory, set forth in the above cases, by relying on several cases from outside the Sixth Circuit.  The two cases DP Plaintiffs rely on most heavily are *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) and *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002).  Notably, however, the Sixth Circuit has not endorsed the approach taken in those cases.

Moreover, as explained below, even if the exception set forth in those cases were adopted by the Sixth Circuit, it would not aid the DP Plaintiffs here.

In *In re Sugar,* a decision issued prior to *Utilicorp.,* the Third Circuit reversed the trial court's grant of summary judgment in favor of defendants.  *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978).  In that antitrust action, it was alleged that twelve defendant refiners of sugar engaged in a conspiracy to fix the price of sugar.  A few of those defendants also used the sugar to manufacture food products, which they sold to wholesalers. One such wholesaler, Stotter, sued, alleging it was injured by virtue of being charged more for various food products which contained sugar.

The Third Circuit noted that Supreme Court precedent "bans Clayton Act suits by persons who are not direct purchasers from the defendant antitrust violator," but questioned whether such precedent also bars "a suit by a plaintiff who purchases directly from the alleged offender but buys a product which incorporates the price-fixed product as one of its ingredients."  *Id.* at 16. Although the court acknowledged that there would "be some additional complications underlying the damage claims," it concluded that fact "must not be allowed to obscure the fact that the plaintiff did purchase directly from the alleged violator."  The court further stated:

> True, the price-fixed commodity had been combined with other ingredients to form a different product.  But just as the sugar sweetened the candy, the price-fixing enhanced the profits of the candy manufacturers.  The situation is the same as if the general contractor which sold the building to the plaintiff in Illinois Brick were the manufacturer of the concrete block which went into the structure.

*Id.* [4]  The court concluded that the concern which the Supreme Court expressed about the proration of overcharge among a number of entities in the chain would therefore not be present.

The Third Circuit concluded that, although the plaintiff did not purchase the allegedly price-fixed product directly, it was not barred from bringing a federal antitrust claim because it purchased a product containing the price-fixed product directly from the alleged violator, who made both the price-fixed product (sugar) and the product containing the price-fixed product (candy).

It is unclear whether the Third Circuit's decision violates the direct purchaser rule as set forth in *Illinois Brick* and *Utilicorp.*  Arguably, it does because the plaintiff did not directly

---

[4]If the general contractor who sold the building to a plaintiff in *Illinois Brick* had also been the manufacturer of the concrete blocks that were the subject of the alleged conspiracy, then there would have been no pass-on theory.

purchase the sole product that was the subject of the conspiracy (sugar).  On the other hand, it

may not because, under those unique circumstances, there is no pass-on theory in play.  In the

situation presented in *In re Sugar*, the plaintiff asserting antitrust injury (Stotter) does not allege

an offensive pass-on theory at all because the defendant at issue made both the price-fixed

product (sugar) and the finished product containing the price-fixed product (candy) and, thus,

there was no middleman. In other words, Stotter was not asserting a pass-on theory because the

Defendant violator that sold it the candy also manufactured the price-fixed sugar and therefore

there was no middleman and thus no issue as to whether or not that middleman absorbed the

overcharge for the sugar.

Here, however, no named DP Plaintiff has alleged that it bought a finished product

containing a compressor from a Defendant who both manufactured the compressors and used

those compressors to manufacture that finished good.  To the contrary, the MAC asserts claims

on behalf of persons or entities who bought a finished product from a Defendant even though the

compressor in that product was manufactured by someone other than that Defendant.  (*See* MAC

at ¶ 48).  The only way that such persons/entities could assert an antitrust injury is via an

offensive pass-on theory (i.e., if all or part of the overcharge for compressors was passed on to

them by the manufacturer of the finished product).  *See Illinois Brick*, 431 U.S. at 727.  Thus,

even if the Sixth Circuit had adopted the rule set forth in *In re Sugar*, it would not aid DP

Plaintiffs here.

DP Plaintiffs' reliance on *General Refactories Co. v. Stone Container Corp., 1999 WL

14498 (N.D. Ill. 1999)* and *In re Linerboard*, 305 F.3d 145 (3d Cir. 2002) is similarly misplaced.

In that litigation, the plaintiffs were purchasers of corrugated containers and corrugated sheets

14

who alleged that defendants conspired to "artificially limit and otherwise reduce the market supply of linerboard in the United States, a primary determinant of the price of corrugated sheets." *General Refactories Co. v. Stone Container Corp., 1999 WL 14498 (N.D. Ill. 1999).*[5] The plaintiffs further alleged that the defendants conspired to fix the prices of corrugated sheets. *Id.* at *1  The defendants were "major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes." *In re Linerboard,* 305 F.3d at 148 n.1.

In *General Refractories Co.*, the district court denied a motion seeking to dismiss the antitrust claims for lack of standing under *Illinois Brick,* in an unpublished decision which discusses the issue of standing in a single paragraph.  Although the district court noted that the plaintiffs had alleged a conspiracy to fix *both* linerboard and corrugated sheets (*see General Refactories Co., supra*, at *1),*[6] when it discussed the standing issue, it relied on *In re Sugar* and concluded that plaintiffs who directly purchased corrugated sheets from the integrated manufacturer had standing.  *Id.* at *3.  The Third Circuit affirmed, based on *In re Sugar.  In re Linerboard*, 305 F.3d at 159-60.

This case can be distinguished from *In re Linerboard* in two important respects.  First,

_____

[5]"Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard."  *In re Linerboard Antitrust Litig*., 305 F.3d at 148 n.1.

[6]The district court noted that the plaintiffs' complaint alleged that the defendants "embarked upon a nationwide combination and conspiracy, the purpose of which was fix, raise, and maintain and stabilize the price of *corrugated sheets* in the United States," that they "agreed among themselves to fix, raise, maintain and stabilize the prices of *corrugated sheets* in the United States," and that defendants "agreed among themselves to implement and coordinate increases in the prices of *corrugated sheets* in the United States." *General Refactories Co., supra*, at *1 (emphasis added).

although the court did not focus on this, the plaintiffs in *In re Linerboard* alleged a conspiracy to fix *both* linerboard (a component) and corrugated sheets (a finished product).  Here, DP Plaintiffs allege only a conspiracy to fix the price of compressors, which they claim had the ultimate effect of increasing prices for compressor products.  That is, the DP Plaintiffs do not allege that Defendants conspired to fix the price of finished products that contain compressors.  That is a fundamental difference because the plaintiffs in *In Re Linerboard* alleged that the defendants had conspired to increase the price of corrugated sheets and that the plaintiffs were direct purchasers of corrugated sheets.

Second, even if the plaintiffs in *In Re Linerboard* had not alleged that the defendants conspired to fix the price of corrugated sheets, the case could still be distinguished from this case because, as explained above in discussing *In Re Sugar*, no named DP Plaintiff has alleged that it bought a finished product containing a compressor from a defendant who both manufactured the compressors and used those compressors to manufacture that finished good.

At best, these decisions reflect that the Third Circuit has concluded that the direct purchaser rule does not apply in situations where a plaintiff purchases a product containing a price-fixed component directly from an alleged violator who makes both the component and the product containing the component.  Again, such a rule, even if it were adopted by the Sixth Circuit, would not apply here.

Accordingly, the Court concludes that the only persons or entities who have standing to assert federal antitrust claims in this action are those persons or entities who directly purchased compressors from a Defendant.  Thus, any named DP Plaintiff who did not purchase compressors from a Defendant lacks standing and must be dismissed from this action.

**B.** **Although The Parties Agree That Any Named DP Plaintiffs Who Directly Purchased Compressors From A Defendant Would Have Federal Antitrust Standing, The MAC Does Not Identify Which, If Any, Named DP Plaintiff Purchased Compressors From A Defendant.**

DP Plaintiffs, as the parties asserting federal jurisdiction, have the burden of establishing standing. *School Dist. of City of Pontiac v. Secretary of U.S. Dept. of Educ.*, 584 F.3d 253, 260 (6th Cir. 2009). Here, because Defendants are seeking dismissal at the pleading stage, "the assessment of standing is confined to the allegations in the complaint." *Id.*

It is undisputed that if any named DP Plaintiff purchased compressors directly from a Defendant who manufactures compressors, that person or entity would have standing to assert a federal antitrust claim in this action. The problem is, the way the MAC is drafted, it is impossible to determine which, *if any*, of the named DP Plaintiffs allege that they purchased compressors directly from a Defendant. This is because the MAC does not identify any named DP Plaintiff who purchased compressors – as opposed to products containing compressors – directly from a Defendant. Rather, the MAC defines the term "Refrigerant Compressor Products" as including both: 1) compressors of less than one horsepower; and 2) products that contain such compressors. Thus, when the MAC alleges that each of the named DP Plaintiffs has "purchased Refrigerant Compressor Products directly from one or more defendants," the MAC does not specify whether that entity is alleged to have purchased compressors, products containing compressors, or both. Accordingly, based on the allegations in the MAC, this Court cannot determine whether any of the named DP Plaintiffs has standing by virtue of having directly purchased compressors from a Defendant.

Although DP Plaintiffs have not filed a motion seeking leave to file an amended complaint, at the May 26, 2011 hearing they requested leave to file an amended complaint.

17

Given that it is undisputed that any named DP Plaintiff who purchased compressors directly from a Defendant who manufactures compressors would have standing to assert a federal antitrust claim in this action, the Court shall grant DP Plaintiffs' request to file an amended complaint in order to specify which, if any, of the DP Plaintiffs have federal antitrust standing by virtue of having directly purchased compressors from a Defendant. The Court shall order DP Plaintiffs to file that amended complaint no later than **July 13, 2011,** and the amended complaint shall specifically identify: 1) each named DP Plaintiff who directly purchased compressors from a Defendant; 2) the Defendant(s) from whom that named DP Plaintiff directly purchased compressors; and 3) where and when such purchases are alleged to have taken place.

## II.    Conspiracy Claims Prior To June 2004 Or After December 2006

The "Class Period" listed in the MAC is from "January 1, 2004 up to and including December 31, 2008." (MAC at ¶ 47).

With the exception of Whirlpool Corporation[7], the Moving Defendants do not dispute that the MAC sufficiently alleges a conspiracy from June, 2004 to December 31, 2006. In their opening brief they contend, however, that the MAC "contains no allegations plausibly supporting the assertion of a conspiracy before June 2004 or after December 31, 2006." (Defs.' Br. at 2). Defendants assert that the "MAC contains no factual allegations that defendants agreed to fix compressor prices before June 2004. *See* MAC ¶ 64 (alleging that certain defendants met in mid-march 2004 to discuss compressor price increases that would not take affect until June 2004)." (*Id.* at 8). Defendants further assert that the MAC does not have any allegations with respect to

---

[7]Defendant Whirlpool Corporation disputes that the MAC sufficiently alleges any conspiracy claim against it and it has filed a separate motion addressing its position.

alleged conspiratorial conduct after December 2006.  Defendants rely heavily on *In re Urethane Antitrust Litig.*, 663 F.Supp.2d 1067 (D. Kan. 2009).

In response, Plaintiffs assert that the MAC does include allegations of Defendants' anti-competitive conduct before June 2004, and after December 2006.  They direct the Court to several paragraphs of the MAC.  (*See* Pls.' Br. at 12).  Plaintiffs also cite a case wherein a district court rejected a similar type of argument, stating: "[n]othing in *Twombly* . . . contemplates this 'dismemberment' approach to assessing the sufficiency of a complaint."  *In re Pressure Sensitive Labelstock Antitrust Litigation*, 566 F.Supp.2d 363, 374 (M.D. Pa. 2008).

In their Reply Brief, Defendants maintain that the MAC does not contain sufficient allegations regarding a conspiracy outside of the June 2004-December 31, 2006 time-period.  They acknowledge, however, that after filing their opening brief Panasonic and Embraco entered into plea agreements that cover 2007.  Thus, Panasonic and Embraco ask the Court to rule that the MAC does not sufficiently allege a conspiracy before June 2004, or after December 31, 2007.  The remaining Defendants still maintain that the MAC does not sufficiently allege a conspiracy before June 2004 or after December 2006.

This Court shall deny Defendant' request to dismiss claims prior to June 2004, or after December 2006, under *Twombly.*

In order to survive a motion to dismiss, DP Plaintiffs must plead "enough factual matter" that, when taken as true, "state[s] a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "In *Twombly*, the Supreme Court held that a complaint alleging violations under § 1 of the Sherman Act cannot survive a motion to dismiss unless it avers facts that raise a reasonable expectation that discovery will reveal evidence of an

illegal agreement." *In re Travel Agent Commission Anti-Trust Litigation*, 583 F.3d 896, 902 (6th Cir. 2009).  Under *Twombly*, "the complaint's factual allegations must be enough to raise a right to relief above the "speculative level."  *Id*.  "Of course [the court] must still 'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff.'" *Id*.  "Yet, to survive a motion to dismiss, the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory."  *Id*. (internal quotation and citation omitted). *Twombly* does "not require heightened fact pleadings of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

Defendants' request is based primarily on *In re Urethane Antitrust Litig*., 663 F.Supp.2d 1067 (D. Kan. 2009) – a district court case from outside the Sixth Circuit.  In that case, the district court concluded that the plaintiffs' allegations regarding the existence of a conspiracy were sufficient for a period of time beginning in 1999.  The district court agreed with the defendants, however, that the plaintiffs "failed to state a cause of action for antitrust liability under the *Twombly* standard for the period prior to 1999."  *Id*. at 1076.  In that case, the district court stated that:

> Under *Twombly,* plaintiffs cannot simply allege a conspiracy beginning at a particular time; rather, they must allege facts to support the existence of a conspiracy during the entire period.  Plaintiffs may not need to allege meetings occurring at any particular intervals; they must at least provide a factual basis for their starting date, however, in order to show an entitlement to relief beginning on that date.  Plaintiffs have not done so here; accordingly, plaintiffs have not stated a claim for antitrust liability (under either the federal or state statutes or European law) for the period from 1994 to 1998, and therefore such claims are subject to dismissal.

*Id.* at 1077.

The district court in *In re Urethane Antitrust Litig*. acknowledged, in a footnote, that the "parties have not pointed the court to any other case in which the defendants attempted to carve out a portion of the alleged conspiracy in this manner." *Id.* at 1077 n.6.  Thus, the ruling in that case is hardly a main-stream position.  Defendants have not identified any Sixth Circuit decisions that support that approach.

Moreover, this Court concludes that *Twombly* does not support such a "dismemberment" or "carve out" approach to assessing the sufficiency of a complaint.  *Twombly* does "not require heightened fact pleadings of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  Here, the MAC contains direct or inferential allegations respecting all material elements to sustain a recovery under the Sherman Act.  Thus, under *Twombly*, DP Plaintiffs have stated a claim to relief under the Sherman Act.[8]

## III.    The Foreign Trade Antitrust Improvements Act

Defendants claim that to the extent that DP Plaintiffs are seeking to recover for compressors purchased abroad, any such claims are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, "which limits the extraterritorial application of the Sherman Act." *National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003).  In their motion, Defendants address the application of the FTAIA to direct purchases of compressors and to its application to products containing compressors.  (*See* Docket Entry No. 164 at 9).  Defendants phrase these arguments this way, and present alternative arguments, because, based on the allegations in the MAC, they cannot

---

[8]In so ruling, this Court is not finding that the MAC states a claim against Defendant Whirlpool Corporation.  Whirlpool Corporation has filed its own Motion to Dismiss, seeking dismissal from this action, which shall be addressed in a separate Opinion & Order.

determine which named DP Plaintiffs directly purchased compressors from a named Defendant, nor can they determine where such purchases allegedly occurred.

The Court concludes that it cannot meaningfully address these arguments until after DP Plaintiffs have filed an amended complaint as directed in Section I. of this Opinion & Order. The Court therefore declines to rule on this ground for relief until after DP Plaintiffs have filed their amended complaint.  After DP Plaintiffs have filed their amended complaint, the Court will issue an order for supplemental briefs to be submitted on this issue.

## IV.    Fraudulent Concealment

The parties agree that the applicable statute of limitations under the Clayton Act is four years.  15 U.S.C. § 15(b); *see also* Docket Entry No. 197 at 19-20 & Docket Entry No. 164 at 13. The parties also agree that the first complaint filed in this action was filed on February 25, 2009, and therefore, DP Plaintiffs may only recover for damages incurred from January 1, 2004 to February 25, 2005 if DP Plaintiffs have sufficiently alleged fraudulent concealment on the part of Defendants.  *Id.*  If DP Plaintiffs have not sufficiently alleged fraudulent concealment, any claims accruing before February 25, 2005 are time-barred.

Whether, in an action based on a federally created right, the doctrine of fraudulent concealment will permit the tolling of the statute of limitations, is a question of federal law. *Campbell v. Upjohn Company*, 676 F.2d 1122, 1126 (6th Cir. 1982).  It is well established that, under FED. R. CIV. P. 9(b), "the party alleging fraudulent concealment must plead the circumstances giving rise to it with particularity."  *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

To satisfy Rule 9(b), allegations of fraud, "at a minimum," must include allegations

regarding the time, place, and content of the alleged misrepresentation. *Coffey v. Foamex L.P.,* 2 F.3d 157, 161-62 (6th Cir. 1993); *see also Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (to plead fraud with particularity, complaint must specify alleged fraudulent statement, identify the speaker, and state where and when the statements were made, and explain why the statements were fraudulent); *Mekani v. Homecomings Financial, LLC*, 752 F.Supp.2d 785, 792 (E.D. Mich. 2010) (same). "The threshold test" is whether the complaint places the defendant on sufficient notice of the misrepresentation, allowing the defendant to answer, addressing in an informed way, the plaintiff's allegations of fraud. *Coffey,* 2 F.3d at 162.

In the Sixth Circuit, three elements must be pleaded with particularity in order to establish fraudulent concealment: 1) wrongful concealment of their actions by the defendants; 2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and 3) plaintiff's due diligence until discovery of the facts. *Id.*

A plaintiff who invokes the doctrine of fraudulent concealment is "held to stringent rules of pleading" and his complaint must contain "distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made." *Pinney Dock*, 838 F.2d 1445 at 1465.

Here, Defendants contend that DP Plaintiffs have failed to plead the first and third elements with sufficient particularity. The Court agrees.

## A.     Wrongful Concealment

To establish fraudulent concealment, a plaintiff must plead specific affirmative conduct on the part of defendants that is separate from the alleged price-fixing conspiracy itself, and that

concealed the means for discovering plaintiffs' claims.  *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004).

DP Plaintiffs acknowledge that they must plead affirmative acts of concealment with particularity, but contend that they have done so.  They direct the Court to the following allegations in the MAC:

- Defendants fixed prices, agreed not to compete for customers, and exchanged market information during regular, secret meetings and communications throughout the entire Class Period.  ¶¶ 62, 97.

- Specific details of certain meetings including where and when the meeting was held, who attended, what was discussed in furtherance of the conspiracy, and specific affirmative acts taken by the Defendants to conceal their unlawful activities. ¶¶ 63, 68-69, 71-72, 74.

- Specific details of secret telephone conversations among the Defendants immediately prior to the announcement of a price increase, including identification of the participants and the subject matter of the conversations.  ¶¶ 65-66, 72-73, 97.

- Defendants agreed not to record the clandestine meetings or to destroy records that might be made.  ¶ 97.

- Defendants actively concealed their price-fixing conspiracy by announcing price increase ranges in amounts exceeding the agreed upon price ranges. ¶¶ 64, 98.

- Defendants traveled to the clandestine meetings separately, so as to not be seen together, and reserved hotel rooms under false names.  ¶ 68.

- Defendants represented that their pricing activities were unilateral, rather than collusive, and were based on market conditions and legitimate business purposes, such as increased input costs, increased demand or declining supply.  ¶ 99.

(DP Pls.' Resp. Br. at 21-22).

Defendants contend that "[i]n the context of a price-fixing claim, allegations that the supposed conspiracy was 'inherently self-concealing,' or that the conspirators merely kept silent are not enough to plead affirmative concealment."  (Defs.' Br. at 15) (Citing *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, 841 F.Supp. 212, 217 (E.D. Mich. 1993)).

The Court concludes that the DP Plaintiffs have not alleged affirmative acts of concealment with sufficient particularity.

Like the plaintiffs in *Dry Cleaning*, DP Plaintiffs make various allegations essentially alleging a pattern of conduct by Defendants which included face-to-face meetings and other communications that were conducted under the cloak of secrecy in furtherance of the conspiracy. Where, as here, the underlying cause of action is based upon alleged antitrust violations and not fraud, the plaintiff is required to plead and prove affirmative acts of concealment.  *Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988).  Alleging "mere silence" or "one's unwillingness to divulge one's allegedly wrongful activities" is insufficient. *Id.*  Thus, DP Plaintiffs' allegations regarding Defendants' secret or clandestine meetings, or their alleged failure to divulge the conspiracy, are insufficient.  There are, however, two different kinds of allegations regarding affirmative acts of concealment which do not fall within that category and require further analysis.

      **1.**     **Allegations That Defendants Concealed Their Conspiracy By Announcing Higher Price Increase Ranges Than The Agreed Upon Price Ranges**

First, DP Plaintiffs contend that they alleged that Defendants actively concealed their price-fixing conspiracy by announcing price increase ranges in amounts exceeding the agreed upon price ranges:

64.   At this meeting [in mid-March 2004], the attendees discussed . . . the need for price increases with respect to Compressors. Specifically, the meeting attendees discussed and reached an agreement to raise Compressor prices by 8-10% in June 2004 throughout the world, including the United States. The pricing agreement reached during this meeting, and other discussions and meetings among the defendants, generally involved a percentage increase in price that the defendants would seek as well as an agreement on what they were likely to achieve.  For example, some attendees would agree to tell customers that they were raising prices by 12% to 14%, while they were secretly agreeing with each other to settle for price increases of at least 8% to 10%.  The meeting attendees also frequently discussed and agreed to refrain from taking each other's Compressor customers.

. . . .

98.   In addition, defendants concealed the existence of the unlawful contract, combination, or conspiracy alleged herein by agreeing on a range of percentage increases in prices to communicate to their customers that was higher than the lower, secret range of price increases to which they had agreed.  For example, defendants agreed to tell their customers that they were seeking, for example, a 12%-14% increase in price, when in fact defendants had agreed with each other to settle for price increases of at least 8%-10%.

(MAC at ¶¶ 64 & 98).

Defendants contend this "allegation is a non-sequitur.  Taking plaintiffs' averments as true, there is no plausible reason why an agreement to ask for a '12%-14%' increase would affirmatively conceal the underlying conspiratorial conduct as compared to asking for a '8%-10%' increase." (Defs.' Br. at 16).   Plaintiffs respond that the alleged "practice demonstrate a deliberate effort to deceive customers into thinking that they were purchasing from their supplier at a price below the amount charged by other co-conspirators.  This would mislead the unwitting customer into believing producers were competing on price."  (Pls.' Resp. Br. at 24).

The Court agrees with DP Plaintiffs that, in theory, this allegation could be construed as an affirmative act of concealment.  The Court finds, however, that these allegations are not

26

pleaded with sufficient particularity because they do not identify which defendants engaged in

the alleged conduct.

> ### 2.     Allegations That Defendants Made Representations That Their Pricing Activities Were Based On Market Forces

Second, DP Plaintiffs stress that they have alleged that Defendants made representations

that their pricing activities were based on market forces, as alleged in Paragraph 99 of the MAC:

> 99.     Before February 18, 2009, defendants represented publicly, both to customers and otherwise, that their pricing activities were attributable to factors other than defendants' illegal scheme and unlawful conduct. Specifically, defendants represented that their pricing activities were unilateral, rather than collusive, and were based upon market conditions and legitimate business purposes, such as increased input costs, increased demand or declining supply.  In making those false representations, defendants misled plaintiffs and the Class as to the true, collusive, and coordinated nature of their price-fixing and other illegal anti-competitive activities.

(MAC at ¶ 99).

These allegations are not pleaded with the required particularity because they group all

Defendants together, and therefore do not identify which of the Defendants such representations

are attributed to, much less the identity of any individuals making such representations.

Moreover, other than alleging that the representations were made at some unspecified time before

February 18, 2009, the MAC does not allege when these representations were made.  The MAC

also fails to allege that the persons who allegedly made the representations knew about the

alleged price-fixing conspiracy at the time the representations were made.  *See Dry Cleaning*,

841 F.Supp. at 218 (statements of representatives who were unaware of any price fixing cannot

be considered as affirmative acts of concealment on the part of defendants).  The Court therefore

finds that DP Plaintiffs have failed to plead this alleged affirmative act of concealment with particularity.

**B.      Due Diligence**

In *Dayco*, the Sixth Circuit noted that "the statute of limitations applicable to private antitrust actions may be tolled where a plaintiff did not file its actions in time because of ignorance resulting from a defendant's fraudulent concealment."  *Dayco*, 523 F.2d at 394.  A plaintiff pleading fraudulent concealment must plead all elements – including due diligence – with particularity.  "[A]n injured party has a positive duty to use diligence in discovering his cause of action within the limitations period.  Any fact that should excite his suspicion is the same as actual knowledge of his entire claim." *Id*.  The plaintiff in that action, after listing the substantive elements of the alleged antitrust violation, "pleaded that even though it had used all due diligence it could not have discovered its cause of action any earlier than 1973, when the government filed a complaint against these defendants."  The Sixth Circuit found that the "mere allegation of due diligence without asserting what steps were taken is insufficient." *Id*.; *see also Gumbus v. United Food and Comm. Workers Int'l Union*, 47 F.3d 1168, 1995 WL 5935 (6th Cir. 1995) ("[T]o overcome a 12(b)(6) motion, the plaintiffs must still plead facts showing that they exercised due diligence.  Plaintiffs' bare allegation to this effect is not enough.").

In *Campbell*, the plaintiff urged the Sixth Circuit to rule that the due diligence standard does not apply to cases of "active" fraudulent concealment where the defendant has engaged in affirmative acts of concealment beyond the original fraud itself.  *Id*. at 1127.  *Campbell v. Upjohn Company*, 676 F.2d 1122 (6th Cir. 1982).  The Sixth Circuit rejected that position.

Here, the MAC alleges that "[b]ecause the contract, combination, or conspiracy was kept

28

secret by defendants, plaintiffs and the Class were unaware that prices of Refrigerant Compressor Products were secretly agreed upon until at least February 18, 2009, when Tecumseh publicly announced that it was the subject of investigations by the DOJ and Brazilian antitrust authorities into the Refrigerant Compressor Products industry, and that the European Commission was investigating the industry as well."  (MAC at ¶ 100).  DP Plaintiff further allege that they "diligently sought to protect themselves from unlawful activity, but it was not until on or about February 18, 2009 that plaintiffs and the Class were able to, or could have been able to, detect the conspiracy alleged in this complaint."  (MAC at ¶ 101).

Like the situation in *Dayco*, DP Plaintiffs allege due diligence without asserting what steps were allegedly taken by them.  The Court finds that DP Plaintiffs have not sufficiently pleaded due diligence under existing Sixth Circuit authority.

Accordingly, because DP Plaintiffs have not pleaded fraudulent concealment with particularity, any claims accruing before February 25, 2005 are time-barred.[9]

## CONCLUSION & ORDER

For the reasons set forth above IT IS ORDERED that "Defendants' Joint Motion to Dismiss Claims by Direct Purchaser Plaintiffs" (Docket Entry No. 164) is GRANTED IN PART,

_____

[9]The Court notes that DP Plaintiffs made a blanket request in the closing paragraph of their Response Brief, asking the Court to allow them to file an amended MAC "[s]hould the Court be inclined to grant any part of Defendants' motion."  They did not, however, file a motion to amend or submit a proposed amended complaint – even after Defendants filed their Reply Brief noting their failure to do so.  Moreover, DP Plaintiffs have not adequately explained, in either their Response Brief or at the May 26, 2011 hearing, how they could file an amended MAC that would plead fraudulent concealment with the requisite particularity. The Court therefore denies DP Plaintiffs' request.

DENIED IN PART, and that the Court DEFERS DECISION on one asserted ground for relief until after an amended complaint is filed.

The motion is GRANTED to the extent that the Court rules that the only persons or entities that have standing to assert federal antitrust claims in this action are those persons or entities who directly purchased compressors from a Defendant.  Thus, any named DP Plaintiff who did not purchase compressors from a Defendant lacks standing and must be dismissed from this action.  The Court hereby GRANTS DP Plaintiffs' request to file an amended complaint in order to clarify which, if any, of the DP Plaintiffs have federal anti-trust standing by virtue of having directly purchased compressors from a Defendant.  DP Plaintiffs shall filed that amended complaint no later than **July 13, 2011**, and the amended complaint shall specifically identify: 1) each named DP Plaintiff who directly purchased compressors from a Defendant; 2) the Defendant(s) from whom that named DP Plaintiff directly purchased compressors from; and 3) where and when such purchases are alleged to have taken place.

The motion is GRANTED to the extent that the Court finds that DP Plaintiffs have not pleaded fraudulent concealment with particularity and therefore any claims accruing before February 25, 2005 are time-barred.

The Court DEFERS DECISION on Defendants' challenge under the Foreign Trade Antitrust Improvements Act until after DP Plaintiffs have filed their amended complaint.  The Court will issue an order for supplemental briefing on this issue following the filing of DP Plaintiffs' amended complaint.

The motion is DENIED in all other respects.

IT IS SO ORDERED.

S/Sean F. Cox _____
Sean F. Cox
United States District Judge

Dated:  June 13, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 13, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez _____
Case Manager